IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **AGALAR ALIEV** | )<br>)<br>) |
| Plaintiff, | ) |
| v. | ) Civil Action No:_____ |
| | )<br>) |
| **EQUIFAX INFORMATION SERVICES, LLC** | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

### COMPLAINT

Plaintiff Agalar Aliev, by and through counsel, brings this Complaint against Defendant Equifax Information Services, LLC. ("Defendant" or "Equifax") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1. Equifax has acknowledged and admitted through its corporate representative in testimony provided in another case in this court, that it does not process the bulk of the consumer disputes it receives concerning the accuracy of data appearing on their Equifax credit files. Instead of complying with its grave responsibilities under the FCRA and §1681i in particular, Equifax outsources these disputes to an unrelated third-party. Not only has Equifax abdicated its duty to investigate these consumer disputes, but it admits that direct Equifax employees do virtually nothing to train, supervise and monitor what hundreds of outsourced processors in India are doing. Equifax readily admits that not only does it not train these processors, but it could not identify or even produce the training materials used to train them. This complete hands-off treatment has allowed this alleged processing program to degenerate into reckless disregard of its duties and obligations under the FCRA. The processors involved in this Aliev matter demonstrated a level

of recklessness and incompetence unparalleled by the other CRAs. In what can only be described as an obvious forgery and identity theft, these outsourced processors bungled the investigation in unthinkable ways. Rather than examine the dispute letter, the information in Equifax's own records and the response back from the furnisher to determine if Mr. Aliev was the one that entered into this automobile loan, the processors swung and missed on each opportunity. First, they sent an ACDV to the furnisher (MECU) but failed to attach the dispute letter or the documents that Mr. Aliev had included. Rather than notify MECU that Mr. Aliev had disputed directly to Equifax, it misrepresented that the dispute only came from a carbon copy notice from Experian. Without conducting any sort of investigation or even waiting for the ACDV response back from MECU, Equifax made its ruling that the disputed account did belong to Mr. Aliev. Unbelievably, the next processors that handled the second dispute letter conducted an even more egregious and reckless investigation. Despite two opportunities to investigate based upon the arrival of the same October 2023 dispute letter via regular U.S. Mail and certified mail (return receipt requested), neither one of these third-party processors conducted any of the required steps mandated by §1681i. They did not conduct the reinvestigation §1681i(a)(1); they did not notify the furnisher of the dispute §1681i(a)(2); they did not consider all the information provided by Mr. Aliev §1681i(a)(4); they did not delete the information because they could not verify its accuracy §1681i(a)(5)(A); they did not provide the results of the reinvestigation to the consumer §1681i(a)(6); they did not respond back to Mr. Aliev's request that they tell him what they did to reinvestigate the prior dispute package §1681i(a)(7) and they failed to add the consumer statement that he requested be added to his Equifax file §1681i(b). Based upon its prior testimony and information and belief, Equifax had no knowledge (after the fact) that these processors had failed so epically in their duties and, therefore, no corrective actions were taken. Thus, not only did these processors violate virtually

every step of the §1681i reinvestigation process, but Equifax did not have adequate monitoring systems in place to notify it of these violations so that it could take corrective actions. Accordingly, Mr. Aliev requests an award of actual damages, statutory damages, punitive damages, attorney's fees and costs based upon Equifax's reckless and intentional violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq.*

## Parties

2. Plaintiff Agalar Aliev is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Agalar Aliev.

3. Defendant Equifax Information Services, LLC (hereinafter "Equifax"), is a foreign limited liability company with a principal office address in Georgia. Equifax is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Equifax regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4. This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p). Venue is proper in this jurisdiction. Plaintiff resides in the Alexandria Division of the Eastern District of Virginia and that forum is the forum most convenient for the adjudication of his claims.

## Factual Allegations

5. On or about October 25, 2021, an identity thief went to Autos Direct of Fredericksburg, VA. ("ADF") and purportedly impersonated Agalar Aliev.

6. ADF sold the identity thief a car and prepared a retail installment sales contract.

7. All of the signatures on the loan documents and other contractual agreements were forgeries and did not look like the signatures on Plaintiff's driver's license. Even an untrained eye could clearly see that they were obvious forgeries. Below is an example of the signatures from the purchase documents and below that is his driver's license with the signature provided.



8. As is evident from the above documents, Mr. Aliev signs his name with a series of loops and there is no way anyone can look at that signature and decipher any of the letters or make out the spelling of the name.

9. The car dealership that sold the truck (ADF) had sold the identity thief a different truck only a few weeks before this transaction in his actual name. ADF was well acquainted with the

4

identity thief, having worked with him over multiple weeks to sell him two different vehicles. ADF has acknowledged that the thief was using an expired Maryland driver's license to purchase the first vehicle in violation of its own policies and procedures.

10. The thief applied for a loan in his own name to purchase the truck in issue (second vehicle) and was denied financing. Next, he applied for a joint loan with Mr. Aliev and that too was denied. Finally, he applied for the vehicle in Mr. Aliev's sole name and that was approved.

11. ADF has admitted and acknowledged that multiple ADF procedures were violated in this transaction and that it could not identify one employee or witness that ever saw Mr. Aliev at this Fredericksburg car dealership.

12. The identity thief failed to make all the payments for the car, and it was eventually totaled by an insurance company. The identity thief worked to have the insurance companies pay down the balance, presumably in an effort to cover the thief's tracks. Unfortunately for Plaintiff, a deficiency balance remained on the account that the thief was not going to pay.

13. The furnisher for the account, Municipal Employees Credit Union of Baltimore ("MECU"), proceeded to report to Equifax that this account was not only late, but ultimately charged off in May 2023 because even after the payment of the insurance policies a deficiency balance remained on the account.

14. In December 2022, Mr. Aliev had disputed the MECU account as fraud with Experian for identity theft. Experian notified Equifax of the alleged identity theft, and Equifax issued an ACDV to MECU dated December 27, 2022. After MECU responded on January 13, 2023, Equifax allowed the MECU account to remain on Mr. Aliev's credit file. Discovery is necessary as to how Equifax conducted this reinvestigation given that Experian provided specific notice to Equifax that Mr. Aliev was an identity theft victim.

5

15. In March of 2023, Mr. Aliev attempted to obtain a copy of his annual free credit report from Equifax. On March 21, 2023, Equifax sent Mr. Aliev a letter that stated Equifax had received a request for Mr. Aliev's free annual credit report, but that "Because the information you provided as proof of your identity does not match the information we currently have on your credit file we ask that you send us a copy of two different items one from each of the two categories listed below." The categories included one for identification and one for a current address.

16. Mr. Aliev complied with Equifax's request by sending a copy of his Virginia's driver's license with his current address and a copy of his social security card. Equifax received a copy of Mr. Aliev's Virginia driver's license and social security card on April 4, 2023, by United States Postal Service priority mail.

17. Despite receiving the Virginia's driver's license and social security card on April 4, 2023, Equifax sent another letter dated April 5, 2023, that again requested the same identifying information to release a copy of Mr. Aliev's credit file. The items Equifax requested once again identified a social security card and driver's license as proper documentation, but Mr. Aliev had already provided this exact information. Throughout Mr. Aliev's contacts with Equifax, it would repeatedly request identifying information like a driver's license and social security card that Mr. Aliev had already provided. Equifax asserts these roadblocks to discourage consumers from knowing what is in their credit files because credit dispute reinvestigation is a major cost of doing business for Equifax.

18. On August 1, 2023, Plaintiff mailed a credit dispute letter with supporting documentation to Equifax via both certified mail and regular first-class mail. The supporting documentation included yet another copy of Mr. Aliev's Virginia driver's license.

19. Plaintiff sent a similar letter to Experian notifying it that he was the victim of identity theft.

20. After receiving the identity theft complaint from the Plaintiff, Experian issued a fraud referral to Equifax placing it on notice that a consumer was complaining about identity theft. Fraud referrals like that, however, do not include the dispute letter or any attachments that the disputing consumer sent to the original CRA like Experian.

21. According to Equifax's documents, Equifax received the Experian fraud referral from Experian on August 10, 2023, which was before it had processed the dispute it received directly from Mr. Aliev.

22. Equifax received the August 1, 2023, credit dispute letter Mr. Aliev mailed via certified mail on August 11, 2023.

23. Equifax does not open its own mail. Equifax hires a mail processor (Canon) as a third-party vendor to open consumer credit dispute letters and scan the documents for processing.

24. The credit dispute package that Equifax received on August 11, 2023, via certified mail contained a typed letter, a copy of the front and back of Mr. Aliev's driver's license, a copy of the retail installment sales contract signed by the identity thief, a copy of a buyer's order signed by the identity thief, and a copy of an account statement from MECU.

25. On August 12, 2023, Equifax sent a letter to Mr. Aliev that stated in part: "We are currently processing your previously submitted dispute for this account(s); we will not be conducting further investigation into this particular account at this time. The results of the investigation into your previously submitted dispute will be sent to you within 30 days of the date it was received by Equifax. If you have additional relevant information or documentation to

7

support your dispute, please provide this information or documentation to support your dispute, please provide this information so that we may further assist you."

26. Equifax also issued a second letter dated August 12, 2023, that yet again requested Mr. Aliev send his identifying information including identity and address verification. This letter ignored that Plaintiff has already provided his identifying information to verify his identity and address in response to prior requests by Equifax. This letter also ignored that Mr. Aliev included a copy of his Virginia's driver's license as part of the credit dispute package.

27. On August 12, 2023, Equifax issued an ACDV to MECU that notified MECU of Mr. Aliev's claims of identity theft and notified MECU that his claim was based upon a referral from Experian.

28. Despite the fact that it had received the dispute letter from Mr. Aliev with his attachments on August 11, 2023, Equifax failed to include them or provide them to MECU as attachments to the initial ACDV dated August 12, 2023.

29. The only information on the ACDV or included as part of the ACDV to MECU was: "[20] CLAIMS TRUE IDENTITY FRAUD – ACCOUNT FRADULENTLY OPENED INITIATE INVESTIGATION. The relevant FCRA information was that the dispute was received from Experian on 8/10/2023.

30. Equifax also received a second copy of the August 1, 2023, credit dispute package via first class mail on August 14, 2023.

31. Equifax's records reflect that the second letter mailed by Mr. Aliev dated August 1, 2023, via regular mail, was received/processed on August 14, 2023.

8

32. By August 14, 2023, Equifax had received the fraud notice from Experian (8/10) the version of the August 1, 2023 letter that was sent by certified mail (8/11) and then the version that was sent by regular mail (8/14).

33. According to Equifax's records it sent a second ACDV to MECU on August 14, 2023. This ACDV presumably was triggered by one of the two dispute letters dated August 1, 2023 from Mr. Aliev. Rather than disclose it as a dispute that was triggered by a dispute letter directly from Mr. Aliev, this ACDV adopted the same information from the August 12, 2023 ACDV: "[20] CLAIMS TRUE IDENTITY FRAUD – ACCOUNT FRADULENTLY OPENED INITIATE INVESTIGATION." In the FCRA relevant information box of that ACDV Equifax once again stated that it was: "RECEIVED FROM EXP DATED 08 10 2023." However, that second ACDV reflected that documents were attached.

34. MECU responded to both of those Equifax ACDVs on August 31, 2023.

35. Equifax sent Mr. Aliev the results of reinvestigation on August 16, 2023 with confirmation number 3228604722. Based upon documents obtained from Equifax, MECU never responded to the two ACDVs until August 31, 2023, so the Equifax results of reinvestigation that it issued to Mr. Aliev were dated two weeks **before** the ACDV responses were returned from MECU.

36. In the August 16, 2023 correspondence with confirmation number 3228604722 Equifax falsely stated, "We are pleased to let you know that the results of the dispute you recently filed with Equifax are complete." This is a false, misleading, and fraudulent statement because Equifax did not reinvestigate the MECU account based on the credit dispute letters that Mr. Aliev sent to Equifax, but rather because Equifax received a fraud referral from Experian prior to receiving the Plaintiff's credit dispute package. Accordingly, Equifax misrepresented that it issued

9

the letter with confirmation number 3228604722 as a result of receiving the written credit dispute package that Equifax received on August 11, 2023 and August 14, 2023 from the Plaintiff.

37. In the August 16, 2023, letter with confirmation number 3228604722, Equifax also falsely stated it provided the credit dispute letter and supporting documentation to MECU when it stated: "We provide them with any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation." This is a false, misleading, and fraudulent statement because Equifax did not send the supporting documentation to MECU after receiving it from Mr. Aliev. Moreover, this is an intentionally deceptive statement because Equifax typically does not send any correspondence to a furnisher and relies upon its outsourced vendor (Teleperformance) to send ACDVs to the furnisher. Equifax wants the appearance that it is investigating disputes by misrepresenting that Equifax conducts the reinvestigation, but in reality, Equifax does not reinvestigate the account and relies on its outsourced third-party vendor, Teleperformance.

38. Equifax's letter with confirmation number 3228604722 also stated that Equifax had researched the account and that it would continue to report that Mr. Aliev owed and was responsible for the account with a past due amount that was $2,696 and a charged-off debt.

39. On or about September 28, 2023, Mr. Aliev issued another credit dispute letter to Equifax in an effort to have the identity theft related MECU account removed from his credit report. The dispute letter included a copy of the signature line of the retail installment sales contract as well as a copy of the back of his Virginia driver's license that displayed his signature. The letter noted that the signatures do not match and that the signatures are not similar in any fashion. The letter went on to request a description of what Equifax did to investigate the previous dispute, and it asks that a consumer statement be added to the credit file.

40. Equifax received the credit dispute letter on October 3, 2023, but Equifax did not take any of the required actions pursuant to §1681i to investigate the credit dispute by issuing an ACDV to MECU.

41. Equifax violated §1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine if the disputed information is inaccurate.

42. Equifax violated §1681i(a)(2) by failing to communicate the relevant information that it received from Mr. Aliev to the furnisher of that information (MECU).

43. Equifax violated §1681i(a)(4) by failing to review and consider all relevant information submitted by Mr. Aliev.

44. Equifax violated §1681i(a)(5) by failing to make the determination of whether or not the disputed MECU account was verifiably accurate and failing to take corrective action.

45. Equifax violated §1681i(a)(6) by failing to provide the notice of the results of the reinvestigation to Mr. Aliev.

46. Equifax violated §1681i(a)(7) by failing to provide Mr. Aliev with the description of the reinvestigation that it had taken in response to his August 1, 2023 dispute letter/package after he had requested it in his September 28, 2023 letter that Equifax received on October 3, 2023.

47. Equifax violated §1681i(b) by failing to add the consumer statement that he had requested in the September 28, 2023, letter that it received on October 3, 2023.

48. Equifax violated §1681i(c) by failing to add the consumer statement that he had requested in the September 28, 2023, and including that in subsequent consumer reports that it provided to third parties.

49. By failing to take action on Mr. Aliev's September 28, 2023 dispute letter that it received on October 3rd, it violated almost every possible provision of §1681i.

50. These violations of §1681i were the foreseeable result of a conscious decision not to conduct the reinvestigation with its own employees as §1681i(a)(1)(A) requires, outsourcing it to a third-party entity that it does not control (Teleperformance), failing to actually train the Teleperformance employees, failing to monitor the actions of the Teleperformance employees, and not being able to even identify the training materials that were used in the training of the Teleperformance employees.

51. After Mr. Aliev never received the results of the reinvestigation of the October 3, 2023 credit dispute letter, Equifax's records demonstrate that it said the dispute documents should be resent to Equifax in a telephone call dated November 4, 2023.

52. On February 9, 2024, Equifax decided to suppress the MECU account from Mr. Aliev's account, and Equifax never informed Mr. Aliev of its decision in February 2024. Based upon information and belief, Equifax did not tell MECU of its decision to suppress the credit reporting for the account.

53. At this juncture, Equifax was a substantial factor in Mr. Aliev refraining from further attempts to obtain credit because Equifax never removed the identity theft related MECU account from his Equifax credit file after his credit disputes.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681i**

54. Plaintiff incorporates paragraphs one (1) to fifty-three (53) as if fully stated herein.

55. Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated

statutory provisions when Mr. Aliev disputed the MECU account in his two written credit dispute letters.

56. Equifax violated 15 U.S.C. §1681i(a)(1) by its conduct related to Mr. Aliev's disputes that it received as identified in the factual averments. With regards to the two written disputes, the letters identified that he was a victim of identity theft, provided examples of his handwriting, a copy of the forged retail installment sales contract, and included other supporting documentation for Equifax to consider and communicate to MECU.

57. The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the consumer's credit dispute letter and unless it is able to verify said information Equifax must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

58. According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate." Based upon the circumstances, Equifax knew that.

59. Equifax violated §1681i(a)(2) by failing to provide all relevant information to MECU after it received the August 1 2023 dispute on August 11, 2023 and failing to send MECU any notification of the dispute and dispute package that he sent Equifax dated September 28, 2023 and it received on October 3, 2023.

13

60. Equifax also violated 15 U.S.C. §1681i(a)(4) after receiving Mr. Aliev's dispute letters because it failed to review and consider the dispute letters including the representations that Mr. Aliev was a victim of identity theft by forgery, review the copies of the documents provided in the dispute letters containing his signatures, and review the underlying documents in the transaction related to the fraudulent sale and finance of the vehicle. Because Equifax uses outsourced third-party processors located in India and other countries, Equifax incentivizes low-cost review at the expense of detailed review and consideration of the specifics of the disputes. These processors are not provided with adequate information access, resources, training, and supervision so that they can execute the grave regulatory responsibilities of §1681i(a)(4).

61. Rather than allow these third-party processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Equifax automates that process and simply sends the ACDV response to its computer for automated updating and processing. As a result, Equifax fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange. This is exponentially more problematic when the CRA fails to fully share with the furnisher the facts, documents and nature of the consumer's dispute. With regard to the September 28, 2023 dispute, the Teleperformance employees failed to conduct any reinvestigation or consideration of the dispute.

62. As stated previously, Equifax violated §1681i(a)(6) by allowing its unsupervised, outsourced, third-party processors to not process the September 28, 2023, dispute and not send Mr. Aliev the results of the reinvestigation.

63. Equifax violated §1681i(a)(7) because it failed to provide a description of the actual reinvestigation that Equifax followed as part Mr. Aliev's dispute after the request stated in second credit dispute letter that Equifax received on October 3, 2023.

64. Equifax violated §1681i(b) by failing to add the consumer statement that he had requested in his September 28, 2023, letter and thereafter violated §1681i(c) by sending out Equifax credit files without that requested consumer statement.

65. Mr. Aliev suffered actual damages including time spent addressing the problem, improper denial of access to credit, discouragement for applying for new credit due to the false account data, frustration of sending dispute letters and having Equifax ignore them and fail to process them, as well as other emotional distress damages with attendant physical manifestations. This fraudulent account caused Mr. Aliev's credit score to drop precipitously which effectively took him out of the market for credit at a reasonable price and terms.

66. In addition, punitive damages are necessary based upon Equifax's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

67. Based upon prior litigation, Equifax has admitted and acknowledged that it outsources its grave responsibilities under §1681i to a third-party (Teleperformance) that it neither controls nor supervises.

68. Equifax does not have its own employees on-site at Teleperformance India to supervise their activities.

69. Equifax claims that it does not and cannot monitor the individual employees that are processing consumer disputes for it.

70. Equifax does not discipline or terminate Teleperformance employees that violate the FCRA, fail to follow §1681i and fail to conduct the mandated steps of a reinvestigation.

71. In Mr. Aliev's case, the violations of the reinvestigation of his identity theft disputes were massive and reckless. These outsourced, third-party processors: 1) failed to send the dispute letter and attachments to MECU; 2) verified the accuracy of the disputed information before MECU responded to the ACDV; and 3) ignored all the steps and procedures for reinvestigating the dispute letter and package that it received on October 3, 2023.

72. Based upon information and belief and documents reviewed in other cases, Equifax has a pattern and practice of refusing to comply with known FCRA reinvestigation requirements including the review and consideration of information in the dispute as well as providing the results of the reinvestigations to consumers. Equifax has been on notice of these issues, and only the imposition of substantial punitive damages will change Equifax's policies. Equifax also knows that outsourced automated data conformity reviews do not comply with its grave responsibilities to assure maximum possible accuracy of consumer credit information.

## COUNT II
### Fair Credit Reporting Act
### 15 U.S.C. §1681e(b)

73. Plaintiff incorporates paragraphs one (1) to seventy-two (72) as if fully stated herein.

74. Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

75. Equifax willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mr. Aliev when it provided a credit report to third parties.

76. Equifax's publishing of the inaccurate information was a substantial factor in the stress and strain from knowing that he could get credit in the manner requested and that current creditors could review his accounts and see the identity theft related charge-off account with MECU.

77. Mr. Aliev suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to obtain a loan, as well as emotional distress damages with attendant physical manifestations. In addition, punitive damages are necessary based upon Equifax's reckless disregard for maintaining and providing accurate information about consumers.

78. Despite having been notified of the identity theft and provided with documentation to prove that the signatures on the loan documents were not only not his, but looked nothing like his, Equifax failed to conduct proper reinvestigations and allowed demonstrably inaccurate credit file data to remain on Mr. Aliev's Equifax credit file.

79. Equifax knows that it has to investigate and verify that disputed credit file data is reporting accurately on its customers/consumer's Equifax accounts, yet it has instituted a practice and procedure that allows unvetted, untrained and unsupervised third-party processors to ignore the requirements of the FCRA and allow inaccurate data to remain on the files and thereafter be provided to or shared with third parties.

80. Punitive damages are necessary because Equifax has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Equifax fails to invest the resources into enacting procedures to protect consumers. Equifax has implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly. Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

## Prayer for Relief

Wherefore, the Plaintiff prays that the Court award the following relief:

a)  Actual damages based upon Defendant's violations of the FCRA;

b)  statutory damages against Defendant's based upon violations of the FCRA;

c)  punitive damages based upon the violations of the FCRA

d)  costs and reasonable attorneys' fees incurred by the Plaintiff;

e)  prejudgment interest

f)  all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted,
Agalar Aliev

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582